## AFFIDAVIT OF TASK FORCE OFFICER GEORGE STEVENS

I, Task Force Officer George Stevens, being first duly sworn, hereby depose and state as follows:

**I.        PURPOSE OF AFFIDAVIT**

1.        The following affidavit is furnished to support the issuance of a criminal complaint and arrest warrant charging:

**Roberta Jay "Bobbie" SEGURA**

**Rochester, NH**

**Michael WOLF**

**Rochester, NH**

with conspiracy to possess with the intent to distribute and to distribute Schedule II controlled substances, namely: fentanyl, in violation of Title 21, United States Code, Sections 846 and 841(a)(1).

**II.        AGENT BACKGROUND**

2.        I am a Task Force Officer with the New Hampshire Attorney General's Drug Task Force ("NHAGDTF") having served in this capacity since November 2018. From 2003 to 2008, I served as a law enforcement officer with the Franklin New Hampshire Police Department. From 2008 to the present, I have been employed as a Deputy with the Carroll County's Sheriff's Office.

3.        In the course of my law enforcement training and experience, I have had an opportunity to search for, seize, and personally observe what I have recognized to be and what

1

was later confirmed by drug analysis to be scheduled drugs, including but not limited to heroin, fentanyl, methamphetamine, cocaine, marijuana (both dried and growing), crack cocaine, and various narcotics lawfully available only by prescription.  I have conducted or participated in among other things, surveillance, undercover transactions, debriefings of informants and confidential sources, and reviews of taped conversations relating to narcotics trafficking.  I have assisted in many other local and state investigations. I have drafted drug related search and arrest warrants and have assisted in the execution of numerous search and arrest warrants in which controlled substances, drug paraphernalia, drug related electronic data, and other contraband was found. Through my training and experience, I have become familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in the trafficking of illegal drugs.

4.      I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

5.      The information set forth in this affidavit is based on my personal participation in this investigation, as well as my training and experience, information received from other law enforcement officers, including their direct examination of relevant documents, and physical surveillance conducted in connection with persons and places mentioned in this affidavit. The purpose of this affidavit is limited to showing that probable cause exists to support the issuance of arrest warrants and criminal complaints.  Accordingly, while this affidavit contains all the material information I am aware of that is pertinent to the requested arrest warrants and

complaints, it does not include each and every fact known by me or other investigators concerning the investigation.

### III.    STATUTORY AUTHORITY

6.      This investigation relates to offenses in the District of New Hampshire ("Target Offenses"), to wit:  conspiracy to possess controlled substances with the intent to distribute and distribution of controlled substances in violation of 21 U.S.C. §§ 841(a)(1) and 846.  Title 21, United States Code, Section 841(a)(1) makes it a crime for any person "knowingly or intentionally to … distribute . . . or possess a controlled substance with the intent to distribute." Title 21, United States Code, Section 846 makes it a crime for any person to "conspire to commit any offense . . . defined in [Title 21]."

### IV.    PROBABLE CAUSE

7.       Based on my training and experience, and the facts set forth in this affidavit, I have probable cause to believe that Roberta Jay ("Bobbie") Segura ("Segura") and Michael Wolf ("Wolf") are engaged in a conspiracy to possess with the intent to distribute and to distribute controlled substances, namely: fentanyl, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 846 and 841(a)(1).

8.       On August 1, 2019, a New Hampshire Attorney General's Drug Task Force ("NHAGDTF") confidential source ("CS") introduced an undercover NHAGDTF detective ("UC") through an unwitting individual to Segura, who on this date sold the UC 9.6 grams of the controlled substance fentanyl as determined by the New Hampshire State Police Forensic Laboratory ("NHSP Lab") in exchange for $400.00.[1]

---

[1] Unless otherwise noted, all of the referenced drug transactions between the UC and Segura were audio recorded and to the extent possible, surveilled by other members of the NHAGDTF.

9.      During the transaction, which occurred in the UC's vehicle in Rochester, New Hampshire, Segura identified herself to the UC as "Bobbie". The UC told Segura that he was looking for a drug source to supply him in the future. Segura provided the UC with her telephone number. After this transaction, the UC positively identified "Bobbie" as Segura from her New Hampshire Driver's License and Rochester, New Hampshire Police Department records.

10.     On August 8, 2019, the UC and Segura exchanged a series of text messages during which Segura agreed to sell the UC approximately 20 grams of purported heroin for $800.00. During the exchange, Segura asked the UC how long it would take him to get to her Rochester, New Hampshire residence.  The UC responded to Segura that he was working and could not meet her until that evening. Segura responded in a reply text, "I have it now but I don't know if he will hold it so just hit me up when you are on your way and I'll let you know." The UC sent a text back to Segura that he "was good for it" and could possibly meet her at 4 p.m. Segura did not respond.

11.     At approximately 3:40 p.m., the UC met with other members of the NHAGDTF who provided the UC with $400 in recorded funds. Through text messages, the UC asked Segura if she was home. Segura responded that she was home and told the UC to text message her when he arrive.

12.     The UC drove under law enforcement surveillance to the area of Segura's residence, located at 5B Lafayette Street, Rochester, New Hampshire.[2] The UC sent her a text that he had arrived to which Segura responded, "OK."

---

[2]                              is an apartment house consisting of four units. Apartment 5B is located on the bottom left floor. There is a front porch with two doors for entry into 5B and 5A.

13.    As the UC pulled in front of the residence, he observed a male sitting on the right side of the porch with the door to unit 5B open. Segura reached out from within unit 5B and motioned with her hand to the UC that she would be one minute before going back inside the apartment.

14.    Soon after, Segura exited the apartment, walked to the UC's vehicle, and opened the front passenger door and stated, "You're Bobby, right?"[3] The UC then asked Segura if she wanted him to drive down the street. As the UC drove, Segura explained that her brother, who the NHAGDTF subsequently identified as Wolf, told her that "that kid Bobby is here." Segura stated that she responded to Wolf that the UC "was no kid."

15.    Segura asked the UC if he ordered "two" meaning two "fingers" of purported heroin. I know based on my training and experience that heroin and fentanyl are packaged for sale in "fingers" and that a "finger" typically weighs approximately 10 grams. The UC responded that he did order two "fingers" and inquired if he could get a better price from Segura in the future if he ordered larger quantities of heroin. Segura responded that she could not do better on this price this time, but would have to talk to *him* about future deals.

16.    The UC told Segura that he did not like to discuss "business" over the phone. Segura responded that she usually refers to drugs as "ice cream" while on the phone or in text messages.  Segura stated that a gallon of ice cream refers to a "finger" of heroin.

17.    The UC continued to drive a short distance with Segura to the end of the street and then reversed his direction so that he was heading back towards Segura's residence. As he

---

[3]  The UC used the alias "Bobby" in this investigation.

did, Segura reached inside of her left bra area and removed what appeared to the UC to be a cigarette cellophane wrap containing two cylindrical shaped objects that contained pressed power wrapped in wax paper and handed it to the UC. The UC provided Segura with the $400.00 in recorded currency. Prior to exiting the UC's vehicle in front of her residence, Segura stated that she formally lived in unit 7B but currently resided in unit 5B. The UC departed the area. The NHSP Lab subsequently determined the substance to be 19.66 grams of fentanyl.

18.     On August 18, 2019, Segura sent the UC a text message from a different phone number. In the text, Segura identified herself, told the UC to text this phone number because it was safe and always on and identified the phone number as belonging to her brother (subsequently identified as Wolf).

19.     On August 20, 2019, the UC and Segura exchanged text messages trying to set up the sale of methamphetamine and heroin to the UC the following day. Segura indicated that she could not sell the UC methamphetamine (which she referred to in code as "ice cream") but could sell the UC three "fingers" of heroin (which she referred to in code as "gallons").

20.     On August 21, 2019, the UC sent Segura a text message asking if she "was up for a visit?" Segura responded in a text message that she would be back at her residence shortly. At approximately 2:00 p.m., the UC sent Segura a text message to let her know that he was a few minutes from her residence.  When the UC arrived, Segura was waiting on the front porch. Segura entered the UC's vehicle and the UC drove down the street. During the drive, the UC asked Segura why she could not get him methamphetamine. Segura responded that she did not have a source who could get her the quantity that the UC wanted. Segura stated that her source(s) only sold in small quantities.

6

21.     Segura then pulled out a small, unsealed envelope from her bra and handed it to the UC. The UC handed Segura $ 1,050.00 in recorded currency. The UC observed that the envelope contained three cylindrical shaped objects that contained pressed power wrapped in wax paper that the NHSP Lab determined to be 29.28 grams of fentanyl. Prior to dropping Segura off at her residence, the UC chided Segura about not having her own phone and told her she needed one because the UC never knew whom he was corresponding with some of the time. Segura laughed and told the UC that her brother (Wolf) told her the same thing. Segura stated that it is either she or Wolf who are communicating with the UC and that she in fact needed her own phone because Segura's "business" was getting "bigger and bigger."

22.     On August 30, 2019, Segura sent the UC a text message from a phone number Segura previously identified as belonging to Wolf (and also used by Segura) that read, "I'm going to be picking up soon so I'll be good." Several hours later, the UC received a text message from the same number that read, "I'm back from picking up and just so you know I have it all the time so when you need just let me know."

23.     On September 3, 2019, the UC sent a text message to the same number stating that he was available if "they wanted to give him a call." The UC received a reply text message that read "OK." Shortly after, the UC received a text message from the same number that read, "it's Bobbie I'm almost home from picking up if you need I will be home but I won't have a very lot tomorrow." The UC asked Segura via text message if she will have his usual "gallons" of ice cream to which Segura later replied, "I will save for you."

24.     On September 4, 2019, the UC received a text message from a new number. The sender identified herself as Segura and stated that this was her new phone number. During a series of text messages, the UC and Segura planned to meet later in the day for the UC to

7

purchase three "fingers" of heroin from Segura for $1,050.00. The UC arrived in front of Segura's residence at approximately 1:55 p.m. and after a brief delay, Segura exited the residence and entered the UC's vehicle. The UC drove his vehicle down Lafayette Street.

25.     During the drive, Segura explained to the UC that she and just Wolf "go down south" a lot and she drives because she has a valid driver's license and Wolf does not. Segura explained that she and Wolf are cautious on these trips. Segura went on to tell the UC that he could "always" call her if he was "looking for more." The UC told Segura that he was selling the heroin "up North", sold all of the drugs in a day and could sell as much as Segura could supply him. Segura stated that she and Wolf went "down" often and that Wolf normally gets "seven" every day or every other day, which the UC understood to mean seven "fingers" (approximately 70 grams of heroin/fentanyl) every day or every other day.

26.     The UC asked Segura what she thought Wolf would charge him if the UC wanted to purchase seven "fingers". Segura responded that she did not know, but would go back and speak to Wolf and let the UC know.  The UC explained to Segura that she had been treating him well but that that he wanted a better price for the drugs. The UC went on to tell Segura that "his money is good" to which Segura responded that she and Wolf know it is good and that is why Wolf did not sell the 30 grams to other customers.  Segura told the UC that she and Wolf were "going to go down and get more" after the sale to the UC.

27.     The UC offered to sit down with Segura and Wolf to discuss future business. Segura agreed and stated that Wolf liked the UC and thought he was a good customer. Segura told the UC that she would talk to Wolf about a price for the seven "fingers". The two set a tentative meeting date of September 17, 2019.

28.     Segura then pulled out a small, unsealed envelope from her bra and handed it to the UC. The UC handed Segura $ 1,050.00 in recorded currency. The UC observed that the envelope contained three cylindrical shaped objects that contained pressed power wrapped in wax paper that the NHSP Lab determined to be 29.28 grams of fentanyl.

29.     On the morning of September 17, 2019, the UC received information from the NHSP that the NHSP stopped Segura and Wolf on the evening of September 15, 2019 as they returned from Massachusetts. The NHSP arrested Segura and Wolf on outstanding warrants. The NHSP seized the vehicle that included Segura's cellphone.

30.     Later in the day, the UC sent a text message to Wolf's phone asking "what was going on?" The UC received a text message back read, "sorry my phone is gone right now but what is the latest you can come?" This response led the UC to believe that Segura sent this response. The UC told Segura via text message that he thought he was meeting with Segura and Wolf to discuss future deals. The UC received a reply message of, "yeah sorry it's been super busy lately with my fiancé pregnant and in bed rest for a lil so can we just meet at the house because I really want to meet and talk to you". The UC believed Wolf sent this message.

31.     The UC responded that he would meet Wolf outside of their residence. Wolf agreed but stated that he "still needed to go down" which the UC took to mean that Wolf still needed to travel to Massachusetts to pick up the drugs.  A short time later, the UC sent Wolf a message inquiring if Wolf would be at his residence at 3:00 p.m. Wolf responded via text that that he would be there but was uncertain if he would have the UC's heroin because he had to "sell the last stick to go down".[4] The UC understood this to mean that Wolf had to sell the drugs

---

[4] I know that the street-term "stick" is another reference for approximately 10 grams of heroin/fentanyl.

he had in his possession to have the funds needed to purchase the drugs Wolf intended to sell to

the UC. The UC responded to Wolf that he would buy the last "stick" from Wolf if Wolf had not

sold it by the time the UC arrived and then would wait for Wolf to travel to Massachusetts to

obtain more drugs "as long as the price was right."

32.     At approximately 2: 42 p.m., the UC sent Wolf a text message asking if Wolf

"was good?" Wolf responded that he had not found a ride to Massachusetts. Wolf stated that he

still had the one "stick" left and would sell it to the UC for full price.

33.     The UC drove to Wolf and Segura's residence, parked and sent Wolf a text

message that the UC had arrived. Segura exited the residence and indicated with her finger that

they needed a moment. Shortly after, Wolf exited the vehicle and entered the front passenger

side of the vehicle while Segura entered the rear passenger seat.

34.     As the UC drove down the street, Segura introduced the UC to Wolf. The UC

told Segura and Wolf that he did not like that they shared a phone since he never knew who he

was texting. Segura stated that he had left her phone in a car and told the UC "to just call

Michael's phone now that you have met." Wolf agreed by stating, "yeah, it would be easier that

way."

35.     The UC told Wolf that Segura told him that Wolf set the pricing and the "go to"

person. Wolf responded in the affirmative. The UC told Wolf that he wanted to sell more drugs

and understood that Wolf was the one going to Massachusetts to get the drugs but that the UC

needed Wolf to sell to him at a better price. The UC explained that he was looking to pick up

"five" (50 grams) today and possibly "ten" (100 grams) the following week.

36.     The UC pressed Wolf for a lower price and the two ultimately agreed to $300.00 per "stick". The UC removed $350.00 in recorded U.S. currency from his pants pocket and handed it to Wolf who placed the money in his pants pocket without counting it. Wolf then pulled a cylindrical shaped object of pressed powder wrapped in wax paper that was in a sandwich baggie from his right pants pocket that he handed to the UC, who placed it in the cup holder of the center console. The NHSP determined the substance to be 9.74 grams of fentanyl. The UC dropped Segura and Wolf off at their residence and departed the area.

37.     Wolf and the UC then exchanged a series of text messages during which Wolf accused the UC of "shorting" him $50.00 by only giving Wolf $300.00 for the drugs. The UC told Wolf that he paid him the $350.00 but nonetheless told Wolf he would pay him an additional $50.00 when they met later in the evening for the second purchase.

38.     At approximately 8:40 p.m., the UC returned to Segura and Wolf's residence after receiving a text message from Wolf that he and Segura were ten minutes away. After the UC arrived, Segura came to the UC's vehicle and placed a child's lunch bag on the passenger seat and stated, "kids snack bag, you know what I mean." The bag was clear on one side and the UC could see that it contained five cylindrical shaped objects pressed in wax paper that the NHSP lab determined to be 49.3 grams of fentanyl.

39.     The UC asked Segura where Wolf was. Segura replied that he was inside. The UC told Segura to go and get Wolf because the UC wanted to speak with him. Segura explained that Wolf was embarrassed because he found the missing $50.00. The UC then removed $50.00 from the $1,550.00 in recorded currency and handed Segura $1,500.00. The UC stated he wanted to purchase an additional ten "fingers" the following week on Tuesday, September 24, 2019. Segura exited the vehicle and returned to her residence. The UC departed the area.

11

40.    On September 24, 2019, the UC met with Wolf in the UC's vehicle in the parking lot of a New Hampshire Liquor Store and "fronted" Wolf $1,500.00 in recorded currency for Wolf to use to obtain heroin/fentanyl in Massachusetts. Wolf entered the passenger side of another vehicle parked in the lot and departed the area. Shortly after, the NHSP conducted a motor vehicle stop on that vehicle and arrested Wolf and Segura, who was also a passenger in the vehicle, on outstanding arrest warrants.

41.    The NHSP transported Segura and Wolf to the Rochester, New Hampshire Police Department for booking. Segura had $1,047.00 on her person $1,000.00 of which was NHAGDTF recorded currency. Wolf had $1,458.00 on his person, $500.00 of which was recorded NHAGTF funds.

42.    The NHAGDTF executed a search warrant at Segura and Wolf's residence and recovered two firearms and $170.00 in cash in a locked safe in a closet closest to Wolf's bedroom. The NHAGDTF determined through a national database check that one of the recovered firearms had previously been reported stolen out of Somersworth, New Hampshire.

## V.    **CONCLUSION**

On the basis of the foregoing information, I believe that there is probable cause for the issuance of a criminal complaint and arrest warrants charging Roberta "Bobbie" Segura and , Michael Wolf with conspiracy to possess with the intent to distribute and to distribute Schedule II controlled substances, namely: fentanyl, in violation of Title 21, United States Code, Sections 846 and 841(a)(1).

/s/ George Stevens
George Stevens
Task Force Officer
New Hampshire Attorney General's Drug
Task Force

Subscribed and sworn to before me on December 17, 2018.

/s/ Andrea K. Johnstone
_____

Andrea K. Johnstone
United States Magistrate Judge